Rawle.
4r 411
135  371

## GRATZ *against* GRATZ.

### IN ERROR.

If the plaintiff and defendant in an action of partition, have by agreement, made partition between them, by which certain parts of the property are united to form one division, and certain other parts to form the other division, the opinion of witnesses is not admissible in evidence to shew that a more equal and convenient partition might have been made by a different arrangement of the parts.

It is no reason for reversing a judgment, that the court below rejected " sundry documents, letters and other papers," not brought up with the record or in any way connected with it, but stated in the bill of exceptions to have been " to and from the parties in the suit touching the premises in question, and matters in dispute," and to have been offered by the plaintiff in error as rebutting evidence to the jury, though similar "letters, documents and other papers as to dates" were previously read by the opposite counsel without objection by the counsel of the plaintiff in error, and without its having been adverted to by the judge, that they were dated after suit brought ; and though the judge rejected the documents, letters and other papers offered, on account of their being dated after the commencement of the action.

A submission of *all matters in variance between the parties,* is sufficient to authorize the arbitrators to award a partition of real estate, and to direct in what manner it shall be executed, provided the partition of the property in question, was one of the matters in variance at the time of the submission ; but if the dispute arose afterwards, an award upon it, is void for want of authority on the part of the arbitrators to make it.

A parol agreement for the partition of lands, is within the act of assembly for the prevention of frauds and perjuries, and does not pass the right which one party had at the time of the agreement to the other, in that part of the property allotted by the agreement to be held in severalty by the latter.

Nor are the facts of one of the parties employing and giving instructions to a scrivener to draw deeds for carrying the partition into effect, and going on the property with an artist and measuring off and designating the lines of division, according to the agreement, for the purpose of enabling the scrivener to draw the deeds and to describe the several allotments with accuracy, or of the other party withdrawing from the possession of that part of it which was by the agreement allotted to the former, and declaring that he held exclusive possession of the residue, which he intended to hold in severalty, according to the alleged agreement, such a part execution of the agreement as will take it out of the act against frauds and perjuries.

If the legal title to real estate be vested exclusively in one of two tenants in common, and the right of the other is merely equitable, being a trust resulting by operation of law from the purchase having been made with their joint funds, it is necessary under the act for the prevention of frauds and perjuries, that an agreement of partition should be in writing and signed by the parties or their agents, thereunto lawfully authorized in writing ; and a parol agreement to make partition will vest no title either in the party holding the legal estate, or in him who has only an equitable interest, in the shares respectively allotted to each.

Arbitrators without a submission in writing, can neither make partition of real property between the parties, nor award a partition to be made, so as to pass the interest of each party to the other, in their respective shares.

An award of arbitrators " that the partition of the *High* street and *Seventh* street property agreed between the parties, according to the plan of *M. B.* shall be carried into effect," is void for uncertainty.

(Gratz *v.* Gratz.)

THIS case came before the court on a writ of error to the District Court for the City and County of *Philadelphia,* in which bills of exceptions were taken to the opinion of that court on points of evidence and in the charge delivered to the jury.

The action in the court below was a summons in partition brought to *December* Term, 1830, by *Hyman Gratz,* the plaintiff in error, against *Simon Gratz,* the defendant in error, for a four story brick messuage or tenement and lot of ground, situate at the south-west corner of *High* street and *Seventh* street from the river *Delaware,* in the city of *Philadelphia,* containing in breadth on *High* street sixteen feet eight inches, and in length or depth on *Seventh* street ninety feet, together with the privilege of and attached to a four feet wide alley on the southern boundary of the lot, and the water course therein, subject to the payment of a yearly rent charge of sixteen pounds, being an apportioned part of a yearly rent charge of thirty-two pounds.

Also, a four story brick messuage or store and lot of ground situate on the south side of *High* street, and adjoining the foregoing messuage on the west, containing in breadth on *High* street fifteen feet five or six inches, or thereabouts, and in depth ninety feet, together with the privilege of and attached to the four feet wide alley aforesaid, bounded eastward by the above described messuage and lot, southward partly by the said four feet wide alley leading eastwardly into *Seventh* street, and partly by ground of *Catharine Cox,* westward by the next following described messuage and lot formerly belonging to *Balthus Emerick,* and northward by *High* street, subject to the payment of the yearly rent charge of sixteen pounds, being the remaining apportioned part of the above named yearly ground rent of thirty-two pounds.

Also a three story brick messuage or tenement and lot of ground situate on the south side of *High* street, at the distance of thirty-two feet or thereabouts westward from *Delaware Seventh* street, and adjoining the last foregoing described messuage and lot to the westward, containing in breadth on *High* street eighteen feet, and in length or depth one hundred and twenty-four feet, to a ten feet wide alley.

Also, a two story brick messuage or tenement and three story brick messuage and lot of ground situate on the west side of *Delaware Seventh* street, between *High* and *Chesnut* streets, containing in breadth on *Seventh* street seventeen feet and extending that breadth from *Seventh* street westward the depth of eighty-one feet, where it widens on the north side thereof to the breadth of thirty-four feet to the ten feet wide alley before mentioned, and from thence extending the last mentioned breadth the further depth of twenty-three feet, making in the whole depth one hundred and four feet, bounded northward partly by a messuage and lot now or late of *Phineas Watson,* and partly by the said ten feet wide alley, eastward by *Seventh*

(Gratz *v.* Gratz.)

street, with the appurtenances to the said messuages and lots of ground belonging.

The defendant pleaded *non tenent insimul.*

It appeared that the plaintiff and defendant, who were brothers, had been in partnership from the year 1797, until the first of *January*, 1827, when the partnership was dissolved. The property in question had been purchased with the partnership funds, but the legal title being vested in *Simon Gratz*, he held two undivided third parts of it for his own use, and the remaining undivided third part in trust for the use of *Hyman Gratz*. After the dissolution of the partnership, the parties were at variance, and other members of the family were involved in their disputes.

For the purpose of putting an end to these disputes, the following agreement was entered into :

" We, the subscribers, do hereby agree to submit all matters in variance between us and any of us, to the award and arbitration of *Charles Chauncey, Horace Binney*, and *Silas E. Weir*, their award, or the award of any two of them, to be final and conclusive between us. And we do hereby give power to the said referees, to order and direct any conveyance, release, deed, or other instrument of writing whatever, from us, or any of us, to the other or others, and generally to order and direct us, or any of us, to do what they may deem expedient for the determination of our controversies, hereby agreeing, that no exceptions whatever shall be taken by us, or either of us, to the said award, and binding ourselves in honour as well as in law, to comply with the same faithfully, immediately on its being made known to us by the referees who sign the same."     (signed)

*Simon Gratz,*
*Hyman Gratz,*
*Jos. Gratz,*
*Jac. Gratz.*

*Philadelphia, June* 8, 1827.

" So far as I have any variance with any of the parties above mentioned, I do hereby covenant and myself a party make to the foregoing submission."          (signed)

*Benjn. Gratz.*

The state of Mr. *Weir's* health not permitting him to act as a referee, an agreement dated *May* fourteenth, 1828, and signed not only by the parties to the submission of the eighth of *June*, 1827, but also by other members of the family was entered into, by which it was agreed, that the award of Messrs. *Chauncey* and *Binney*, and if they differed of any third person to be chosen by them, should be of the same effect as if Mr. *Weir* had proceeded in the arbitration and joined in the award ; and the parties gave to those gentlemen the same power, and agreed to conform to their direction in the same manner as was provided in the submission to them and Mr. *Weir.*

The matters submitted to the referees were numerous and complicated, and several awards were made from time to time in relation to them, but none of these awards embraced the property in question. The plaintiff and defendant being unable to agree as to the partition of it, they, on the tenth of *February,* 1830, agreed that *Michael Baker,* who was mutually chosen by them for this purpose, should " divide the property in *High* and *Seventh* streets, with the following objects :

" In the *first* place to make such a division as will be best, or most for the interest of the property :

" In the *second* place to make the three lots as nearly equal in value as practicable ; but not to injure the property by endeavouring to make them equal, and not to return any valuation thereof.

" The property to be divided is all the property of *Simon* and *Hyman Gratz,* at the south-west corner of *High* and *Seventh* streets, and the store and lot in possession of *Thomas Harper* and on the ten feet alley on and running into *Seventh* street."

On the twelfth of *February* 1830, Mr. *Baker* made the following report :

" *Philadelphia, February* 12, 1830.

" The subscriber, at the request of Messrs. *Simon Gratz* and *Hyman Gratz,* to divide the property at the corner of *Seventh* and *Market* streets, and the stores and lot that are occupied by Mr. *Harper,* as said property described by a plan given by said *Gratz* to the subscriber, numbered and marked in said plan, and to be divided into three shares ; after due consideration, I have divided the same as follows :

" That is to say, No. 1 and No. 6, consist of one share, and the vaults under the yard, with the privilege of said alley back, and the use of said privy forever, with one thousand dollars paid by No. 3 and 4 to this share ; the said share receiving the above amount, and use of said alley, as laid down in said plan.

" No. 2 and 5 consist of one share, agreeably to the plan given, with the exception that No. 3 have the privilege of a privy in the small alley next to Cox's estate ; and this share to have the privilege of the alley laid down on the plan, with the use of the privy and alley, and the ground that the fire-proofs are on, to be so divided, that each fire-proof remains as they now stand, with one thousand dollars paid by No. 3 and 4 to this share.

" Nos. 3 and 4 consist of one share, agreeably to the plan given, with the right of alley, as laid down on said plan, and have the privilege of a privy forever, in the small alley adjoining Cox's estate, with the ground that the fire-proof stands on, to be so divided that the fire-proofs remain as they now stand, and this share to pay each of the other shares one thousand dollars, the ground-rent to remain on the shares as they now are."     (signed)     *Mich. Baker.*

The plan referred to by Mr. *Baker* is here given :

(Gratz *v.* Gratz.)

High street.

On the day of the date of Mr. *Baker's* report, *Hyman* addressed a note to *Simon Gratz*, in which he informed him that Mr. *Beates,* the conveyancer, had orders to draw the deeds, and that on Monday morning following, Mr. *Hains*, the city regulator, would make a survey of the property, and return a draft of it to Mr. *B.* On the fifteenth of the same month, *Hyman* wrote again to *Simon*, saying, " that as the division of our joint property which was proposed on

Friday last, will not make an equitable or equal division according to its value, which was the object intended by it, I shall decline entering into the arrangement, and shall retain my one-third interest in the property." On the same day *Simon* wrote a note to *Hyman* in which he said, " we having confirmed Mr. *Baker's* division of our property on *High* and *Seventh* street and on *Seventh* street, and having divided the same in the presence of Messrs. *Binney* and *Chauncey*, I shall require the deeds to be executed and delivered in conformity to that agreement. Should there be any loss of interest in consequence of your non-compliance, it must necessarily fall on you. I am prepared to carry into effect all which it is incumbent on me to perform in the premises." On the sixteenth, *Simon* gave notice in writing to *Hyman*, that the referees would meet on the following day. On that day *Hyman* read before the referees a paper, in which he stated, that they had not agreed and could not agree, and then proceeded to point out the inequality of the partition, and his reasons for not agreeing to it.

On the same day the referees made an award in these words :

"*Philadelphia, February* 17th, 1830.

"Gentlemen,—We are of opinion, and do award, that the partition of the *High* street and *Seventh* street property, agreed on between you, according to the plan of *Michael Baker* shall be carried into effect.

Respectfully yours,
(signed) . *Ch. Chauncey,*
*Hor. Binney.*"

Messrs. *Simon* and *Hyman Gratz.*

A paper dated *March* 3d, 1830, was drawn up by *Hyman Gratz,* and read by him to the referees on the 9th of that month, in which he entered at length into his reasons for declining to acquiesce in their award of the 17th of February, without making an effort to induce them to review their opinion, which he considered highly prejudicial to his interests. Among other things, he stated, that it was true that when the plan was returned by Mr. *Baker,* and before the referees, he said that *Simon* might have his selection, but that it was an unguarded and unreflecting concession, made by him without a correct understanding of the partition, as made by Mr. *Baker,* and ought not to be considered as binding on so important a part of his whole property.

A paper also dated the 3d *March,* 1830, was read by *Simon Gratz* to the referees, in which he opposed the rehearing requested by *Hyman,* and gave his reasons therefor.

On the 21st of *April,* 1830, the referees transmitted to Messrs. *Simon* and *Hyman Gratz,* the following note :

"Gentlemen.—After much reflection upon the subject of our award of 17th *February* last, in regard to the real estate on *High* and *Seventh* streets, and with sincere regret at the want of concert be-

(Gratz *v.* Gratz.)

tween you in carrying that award into effect, we are under the necessity of declining to make a further award in relation to it.

We are Gentlemen, respectfully, your obedient servants,

(signed) *Hor. Binney,*

*Ch. Chauncey.*"

Messrs. *Simon* and *Hyman Gratz.* *April* 21, 1830.

After several notes had passed from *Simon* to *Hyman Gratz*, from the referees to *Hyman Gratz*, and from him to them, the referees addressed to that gentleman, the following note :

"Sir.—We have omitted hitherto to answer your letter without date, in reply to ours of the 29th ulto. in consequence of other engagements.

"To so much of it as regards the distinction between awards made by the referees, acting upon and exercising their own judgments, in relation to the matters awarded, and that which you suppose has not been so made, we reply, that the distinction arises from misapprehension. We have made no award without acting upon and exercising our own judgment, in relation to the matter submitted to us. In the case of the partition, we exercised no judgment in regard to the manner in which it should be made ; because that matter was not submitted to us, nor have we made any award upon that point. The question to us was, whether an agreement, made in our presence, in regard to a mode of partition, made and assented to by the parties, should be carried into effect. Upon this matter in dispute, to wit, the agreement, we acted, and exercised our own judgment, as we have done in all other cases, and have made our award in conformity to it.

"To the request contained in your former note, that we should receive certain money from you, and deliver you certain deeds, we are under the necessity of replying, that we cannot accede to the request. The award, in regard to the agreement of partition, has an immediate bearing upon this matter ; and we cannot agree to change the present situation of the parties, without the consent of both.

"We are, respectfully, your obd't serv'ts,

*Ch. Chauncey,*

*Hor. Binney.*"

Mr. *Hyman Gratz.* *Philada. May* 12, 1830.

A considerable number of other notes, letters and papers, passed between the parties and the referees, relative to the various matters in dispute between the parties, as well as to the partition of the property in question, and were given in evidence on the trial, but it is unnecessary to state their contents.

*Horace Binney,* Esq. who was examined on the trial in the court below, on the part of the defendant, deposed as follows:—A great many times in the course of between two and three years the parties appeared before us. This tribunal was constituted for the purpose of settling differences which were numerous and complicated beyond my conception before I entered upon the duty. The family had been

apparently in great confidence for many years, and had closed very little as respected themselves. The controversies had spread over twenty-seven or twenty-eight years. They had an immense field of dispute, involving all kinds of property and a great variety of transactions. My impression is, there were between sixty and one hundred points upon which we awarded. We took up these controversies as presented; as each was made known to us we proceeded to the consideration of it; and after hearing all that these gentlemen thought proper to give evidence of, we would pass to another matter; often going to other work before coming to a decision; and then we would frequently make *provisional* awards to show that we did not dispose of all the matters submitted to us. In fact we were a sort of standing tribunal for these gentlemen, for the space of between two and three years, to dispose of all matters which they stated to be in controversy between them.

It happened in one instance, after we expressed our opinion, that it was suggested that the matter required re-consideration and we gave it.

My recollection as to partition is pretty strong. We kept no record, but notes of our awards. Before any thing was done at the meeting at which the paper addressed to *M. Baker* was prepared, a wish was suggested, and I think by Mr. *Hyman Gratz,* that the referees should divide this property themselves. But on its being remarked by one of us that we did not feel ourselves competent to the discharge of that duty, there was no further expression of that wish. But it was still desired that we would assist them in promoting the partition by themselves, or by others for them, to which we made no objection; and it was accordingly at this meeting desired by both the gentlemen, that we should draw up heads of instructions to be given to *Michael Baker* to govern him in the plan of division. Mr. *Baker's* name was not suggested by either of the referees, but the gentlemen gave us to understand he was mutually agreeable to them, and they wished this should be communicated to him as our request. I have no distinct recollection of the terms, except that there was to be no valuation. That seemed to be indispensable by one of the gentlemen and not opposed by the other, and accordingly these heads of instruction were drawn up by myself and approved by both the gentlemen. I did not see Mr. *Baker* myself until he was called as a witness at the counting-house. The referees were brought together at a subsequent day, after we heard Mr. *Baker* had executed his duty, and the proceedings of that day I have as fresh a recollection of, as if they occurred yesterday. The plan of division reported by Mr. *Baker* was read to us. *Simon Gratz* said he was not altogether satisfied with it, and Mr. *Hyman Gratz* said he was; that he thought it a very good partition. *Simon* said he thought it had not been made in conformity with the instructions, which said there should be no valuation, whereas Mr. *Baker* reported that one was to pay the other. Mr. *Hyman Gratz* repeated his belief that the partition was a just and proper

(Gratz *v.* Gratz.)

one, and said, I am so satisfied of its equality that I am willing *Simon* shall have the two first choices, or the first selection of two lots.　To which Mr. *Simon Gratz* replied, if that is understood I have nothing more to say.　Mr. *Hyman Gratz* repeated his willingness again; and then Mr *Simon Gratz* said he took Nos. 1 and 6, and Nos. 3 and 4; after he said this Mr. *Hyman Gratz* said that he was perfectly satisfied, and the parties and referees then adjourned.

The title papers were with Mr. *Chauncey*, and I have no particular recollection as to what took place as to deeds.　Some few days after this, I understood that *Hyman* was dissatisfied with the allotment.　We were called together, as was the practice, and we came together.　As I understood, the particular matter in dispute was, whether this agreement, made in our presence, should be carried into effect.　*Simon* advanced reasons why it should be, and *Hyman* why it should not be ; and after we had heard them as fully as either of them deemed necessary,—they never were restricted—we determined the interview; and neither of us thinking that anything had been shown why that agreement should not be carried into effect, made an award, conformably to our practice, that it should be.

We were afterwards requested by *Hyman* to review the award, and it was particularly desired that we should see the property, and hear the testimony in regard to it, by Mr. *Hyman Gratz*.　Mr. *Chauncey* and myself were doubtful whether we should take that course ; we had formed and expressed no opinion relative to the partition, and to hear evidence relative to the character and propriety of it, seemed to go out of the submission which had reference to the agreement, and not to the character of the partition.　We, however, concluded to go, knowing that we were the masters of our own judgment, and wished to do what was agreeable to the gentlemen, of whom we were the friends, as well as acting in the professional character.　We did go : there was a meeting at the property ; Mr. *Baker* and Mr. *Beates* were there; we went over the property to the ridge-pole of the house, and we heard and saw whatever was offered to us to see and hear, and finally communicated to them, that we did not think it right or proper to make any other award than we had done.　I was governed, myself, in that course, by this consideration, and I have no reason to think that Mr. *Chauncey* acted under any other.　I was present, and heard the agreement in regard to Mr. *Baker's* interference, and the subsequent allotment, and I had no recollection then, and have not now, that *Hyman Gratz* ever made any suggestion that he had not made the agreement; that he had not made the offer to *Simon* to make his choise, and expressed himself satisfied afterwards.　I have no recollection of any express confession or concession of our authority to decide, nor of any express denial at the meeting preceding the award.　The acts at that meeting on the part of *Hyman Gratz*, consisted of a statement of his objections to carry that agreement of partition into effect.　I have still

a recollection of some of the circumstances that he alleged as his reasons; one was a mistake, or oversight rather, in not perceiving that Mr. *Baker* had given a privilege of the alley to No. 3, though it was on the paper of Mr. *Baker* very clearly ; another was, it came in the end to the inequality of the partition ; pointing out expenses and inconveniences; these matters were submitted to our considera-tion, and certainly to our judgment. There was no difference be-tween this and the fifty meetings we had had. I do not recollect that these gentlemen ever questioned our authority to do any thing rela-tive to their difficulties. The authority was just as broad as the controversies, and there was little on which they did not disagree ; it was one general and pretty universal discord. At a subsequent day, two or three months after, Mr. *Hyman Gratz* did address a letter, which contains some doubt of our authority. It is the letter of the twenty-fifth of *June.*

"It never was a subject referred to the arbitrators, whether that division of the property should be carried into effect or not."

Previous to this, there was a communication, stating that we had not brought our judgments to bear upon it. He brought directly before us the character of that agreement. He said he had made it hastily, inconsiderately, at the meeting preparatory to the award. This sort of interference by us, occurred more than once, of directing things to be done, without doing them personally by ourselves. They agreed that western lands should be sold ; we did not judge of the price, but directed that power should be given to agents to sell ac-cordingly. These acts were not at all distinguishable from the one in question. There was something like a rough calculation made by *Hyman* at the meeting, as to what he would have to pay for his part of the incumbrances to have his property clear. They parted with the express determination to carry that partition into effect.

No distinction appeared at any time between questions that arose after the submission and those before. One arose entirely subse-quent, and might be considered altogether independent of the original controversy. While we were holding under advisement how money belonging to a foreigner should be disposed of, we were informed that *Joseph Gratz* had taken out administration to *Jonas Heirshel Black;* we directed them to be cancelled, and *Simon* and *Hyman Gratz* to administer. The order I believe was acquiesced in. I know of no instance of an union between the parties except when we directed ; and when we did direct, generally no want of acquiescence. Towards the last, when there were mutual awards, there sometimes was difficulty. We ordered conveyances as to property of which *Hyman* had not the title. *Jacob Gratz* had the title to No. 6, and we directed the conveyance. *Hyman Gratz* having no title to the property, we directed that deeds should be executed, and handed to us as escrows, and remain with us to be delivered over to *Hyman.* They never were so delivered. They were to be, when a condition should be performed which we never considered complied with.

(Gratz *v.* Gratz.)

My impression is—1 have no recollection of any thing that prevented the delivery of the deeds for the corner property, when that for the *Harper* property was delivered, except the existence of incumbrances given by *Simon* alone. I have no recollection of *Simon Gratz* stating, that this mode of subdivision would be injurious to the whole property, or that this block ought not to be divided. I have nothing on that subject that ought to be stated as evidence. There is nothing at all on my mind like the first—there is a vague impression that something was said about the block going altogether—except what is said in his letter of the third of *February.*

*Charles Chauncey*, esquire, was also sworn, and gave the following evidence.—I think Mr. *Beates* called on me after one of the gentlemen for the deeds, and I delivered them to him. My recollection, as far as it goes, induces me to suppose Mr. *Binney's* statement is accurate. We did distinctly state in the first instance, that we did not consider the partition of real estate within our province, and said, 'if you cannot agree among yourselves, that is a matter you must go into the courts for.' The agreement was made exactly as Mr. *Binney* has stated, in our presence. Subsequently, 1 think, there was at one time some attempt made to obtain a valuation. *Paul Beck*, Mr. *Richards* and *Horner* were named; perhaps that was as to the rents that should be paid by *Simon Gratz & Son* for the store occupied by them. I rather think it was. I have no recollection of any thing material in addition to what Mr. *Binney* has stated. We inspected the property, and heard the statements of Mr. *Baker* and Mr. *Beates.* I believe they were brought by *Hyman Gratz* before us.

I think the non-delivery of the deeds for the undivided third, was caused by the existence of incumbrances. The incumbrances were for the benefit of the firm.

*Isaac Prince*, who was likewise examined, testified as follows:— Mr. *Simon Gratz* has held the parts allotted to him by the division, No. 1, and No. 3, and No. 6. He is in the habit of getting the rents, from since the twelfth of *February.* The division No. 4, is occupied as a store by *Simon Gratz & Son*, the rent of which was credited to *S. & H. Gratz* up to twelfth of *February*, 1830. He has had nothing to do with No. 5; it has been unoccupied—shut up for a long time. I do not know where the keys are. They are in the possession of Mr. *Hyman Gratz*, I believe.

Mr. *Oakman* occupies No. 2. Walls have been run up by Mr. *Simon Gratz*, so as to make the properties distinct, between Nos. 4 and 5, and between 4 and 3 and 2.

Mr. *S. Gratz* made leases of the property held as his share. I am familiar with his concerns. I know of no act of ownership exercised by him on the parts said to have been allotted by him to *Hyman Gratz*, since the division.

I should say between three and four years ago, this dispute was before referees. At the time of the dispute, No. 5 was occupied as the counting-room of *S. Gratz & Brother;* No. 4, as the store of *S.*

*Gratz & Son;* the other properties were under rent. *Hyman* has not, that I recollect, for some time interfered with *Simon Gratz's* possession. I occasionally collected the rents of the property, previous to twelfth of *February.*

The privy in the alley has not been used by Mrs. *Cox* for a great many years. Now it is used as a scale room for weighing—has been for many years. The privies in actual use are five, as on the plan.

Privy No. 5, is used by *Simon Gratz & Son.* The alley next Mrs. *Cox* is not used at all, except to go to the scale room, by *S. Gratz & Son.*

I do not recollect who uses No. 4; we have no key of it. I believe it is not used.

After the division of the property, twelfth of *February*, 1830, Mr. *Oakman* called to pay his rent, which I refused to receive, from the belief that it was not the property of *S. Gratz.*

*Frederick Beates* was also sworn and examined, and stated as follows:—*Hyman Gratz* called on me of a Friday, twelfth of *February*, 1830. He stated he wished me to see Mr. *Chauncey*, to get some papers necessary to draw a deed of partition between *S. Gratz* and himself. *Hyman Gratz* gave me a rough plan of the division. He stepped with me to Mr. *Chauncey's* to get the papers, which I received from Mr. *C.*, and having glanced my eye over the plan I got from Mr. *Chauncey*, and the one from Mr. *Gratz*, I found they were not so distinct as to enable me to go on and draw the deeds. Some lines were not mentioned, and I said there must be a survey. A deed, and the report of Mr. *Baker*, and a draft, I received from Mr. *Chauncey.* Finding a survey necessary and a proper draught, Mr. *H. Gratz* returned with me to *Third* and *Arch* street; he left me then and said he would go to Mr. *Haines* and get him to make the necessary survey and draft. On coming home and looking at the papers I got from Mr. *Chauncey*, I found there was a privilege given to *Simon Gratz* in a lot, that I apprehended was to be allotted to Mr. *Hyman Gratz*, that I did not apprehend was intended to be given to him. I met *Hyman Gratz* next day, Saturday, in *Fourth* street, and told him I discovered a difference between the papers. He told me it was impossible. He called on me on Monday to satisfy himself, I suppose, about my being correct. On his perusing the papers he found I was correct. He said it was not right—seemed a good deal chagrined and mortified. He then wished me to return the papers again to Mr. *Chauncey.* This note I wrote the sixteenth of *February*, 1830.

" At the request of Mr. *Hyman Gratz*, I return you the enclosed documents."

I was requested by Mr. *Simon Gratz* to get them again. I asked Mr. *H. Gratz* for some explanation, and he said he would have nothing to do or say with it—that was when I had *Haines'* draft. I can't exactly say when I got *Haines'* draft. I did not get it for a

(Gratz *v*. Gratz.)

considerable time after the other. He called at the office and treated this as if he had no concern with it.

" *Charles Chauncey*, Esq. Dear Sir : Please let me have the draft made out by Mr. *Hyman Gratz*, of the *Market* street property ; neither of them I have, show the understanding respecting the division walls. Yours humbly, *Fred. Beates.*—23d *Feb.* 1830."

This was after I got an explanation from *Simon Gratz*. I don't know whether I had Mr. *Haines*' at the time when I got back the papers. This was the draft sent, with the pencil mark upon it. It was necessary to incorporate it in the deed.

The deed was signed by *Simon Gratz*, and left with me to be signed by *Hyman Gratz*, and then consummated and witnessed. It was left with me a considerable time. I told *Hyman Gratz* when he came there, it was left by his brother for his signature. He said he had nothing to do with it. The dot is often made by the magistrate when one of the parties executes and acknowledges the deed.

1 believe I got *Haines*' survey from him.

I was examined before Messrs. *Binney* and *Chauncey*. I can't say who took me before them.

*Samuel Haines* was also called as a witness, and gave the following testimony :—In the early part of *February*, 1830, *Hyman Gratz* called on me and said, he and his brother were about making a division of their property at the corner of *Seventh* and *Market* street, and wanted a survey and plan. The weather was cold and unfavourable, and 1 was prevented from going ; and a message was sent to me, to make haste. I understood the message to be from *Hyman Gratz's* counting-house. I afterwards went, on the fifteenth of *February*. Both of the parties were there during the time of making this survey and measurement. I made a plan of it. That plan was delivered by me to some person : I don't remember. Previously to making the plan, I received a message, as the person said, from *Simon Gratz*. The plan was eventually in the hands of Mr. *Beates* when I attended to give him an explanation of it, to enable him to draw the deeds as I understood it. Mr. *Hyman Gratz* was the first person who called on me. I had no papers but a little plan. Every thing I understood as coming from *Hyman Gratz*—so much, that I did not pay much attention to it. I do not know from whom I got the papers.

I took a measurement on the ground, marking the lines on the walls.

I think No. 1 is the plan. It is likely I got this No. 1, at the counting-house, while I was on the ground for the purpose of measuring. I think Mr. *Simon Gratz* requested me to be careful of it, and return it to him or somebody else.

The No. 1. is the only plan I ever had in my possession, I think. I say with caution, that I *think* 1 went to the ground without one. My impression is, I returned it to Mr. *Simon Gratz's* messenger. A messenger came to me, as I understood, from *Simon Gratz*, to hasten

(Gratz *v.* Gratz.)

me. The messenger was a young man. He called more than once. I think it was the same who first called.

I think it was not Mr. *Prince* who called. There were young men in the counting-house that I took for Mr. *Gratz's* sons, and I thought it was his son that called on me.

The bill of exceptions returned with the record, after the introductory part of it, and after referring to certain evidence which had been given by the parties on both sides, proceeded thus:

" And in the further progress of the trial, the plaintiff offered *Michael Baker* as a witness, who was qualified, and testified as follows:

" ' My impression is, that both were together. I objected to having any thing to do with the property. I was told by both those gentlemen, that I was to take the plan, and divide the property into six numbers. I divided the property equitably, as I thought, and returned a report to that effect. This is the report. Nos. 2, 3, 4 and 5, is the property that was most suitable together—'

" At which period of the testimony the witness was stopped by the counsel for the defendant, who objected to the last clause of the witness's testimony (the objection to be considered as having been made before the witness gave that part of his testimony, as opinion of the best mode of dividing, &c.) and after argument, the testimony objected to was overruled by the court ; whereupon the witness was withdrawn by the plaintiff's counsel as to any further testimony, and the plaintiff's counsel excepted to the opinion and decision of the judge.

" And in the further progress of the trial, the plaintiff's counsel offered to read, as rebutting evidence to the jury, sundry documents, letters and other papers, (prout letters, documents, and other papers annexed) of a date subsequent to the commencement of the suit, but the same was objected to and overruled by the judge ; the same being letters, documents and other papers, to and from the parties in the suit, and touching the premises in question, and matter in dispute, and similar letters, documents and other papers, as to dates, having been read previously by the defendant's counsel, without objection by the plaintiff's counsel, and without it having been adverted to by the judge that they were dated since the suit brought. Whereupon the counsel for the plaintiff excepted to the decision and opinion of the court in objecting to and overruling such evidence so offered by the plaintiff's counsel."

In the further progress of the trial, before the judge charged the jury, the counsel for the plaintiff requested him to instruct the jury as follows: to wit,—

" 1. The parties have not made a legal partition of their joint estate ; because there must be a writing signed by the parties or by the plaintiff, or by an agent thereto lawfully authorized by him, granting, assigning, or surrendering the two-thirds of the premises to *Simon Gratz* in severalty.

(Gratz *v.* Gratz.)

" 2. There is not a sufficient writing signed by the parties or by *Hyman Gratz*, granting, assigning or surrendering the two-thirds of the premises to *Simon Gratz* in severalty.

" 3. There is not a sufficient writing signed by any agent of *Hyman Gratz*, thereto lawfully authorised by writing, granting, assigning or surrendering the two-thirds of the premises to *Simon Gratz* in severalty.

" 4. The two-thirds of the premises have not been granted, assigned or surrendered to *Simon Gratz* by act and operation of law.

" 5. That any parol agreement by *Hyman Gratz* sufficient to grant, assign or surrender the two-thirds of the premises to *Simon Gratz*, must be found by the jury to have been partly performed by *Hyman Gratz ;* otherwise it does not vest the two-thirds of the premises in *Simon Gratz* in severalty.

" 6. That any possession of *Simon Gratz*, given in evidence by him as part performance of such agreement, must be a possession of the two-thirds of the premises obtained by the mutual consent of both parties, and delivered or assented to by *Hyman Gratz*, in pursuance of and in order to execute such parol agreement.

" 7. That the instructions by *Hyman Gratz* to *Beates* to prepare the deeds, to Mr. *Haines* to make a survey of the premises, and the marking the division lines by Mr. *Haines*, are not a part execution and performance by *Hyman Gratz* of the parol agreement, unless the jury are satisfied that afterwards *Simon Gratz* went into the possession of the two-thirds of the property by the plaintiff's consent.

" 8. That the receipts of the rents by *Hyman Gratz*, given in evidence on the part of the defendant, are not a part performance or execution of the parol agreement by the plaintiff, nor are they in law a taking of possession of the houses, for which the rent was paid as the separate property of the plaintiff.

" 9. That the award of the seventeenth of *February*, 1830, vests no separate estate in the parties, because it does not direct that mutual releases, conveyances or assurances be executed by the parties.

" 10. And that if it had so directed, it would not have been binding on the plaintiff, unless acquiesced in or executed by him.

" 11. That the estate of the parties in these premises was by the title deeds to *Simon Gratz*, and the entries in the books of *S.* and *H. Gratz*, an estate in joint-tenancy.

" 12. That the estate of the parties in these premises is embraced within the provisions of the statute of frauds and perjuries. '

" That if the court should be of opinion that the estate of these parties was such an estate as not to be within the statute of frauds and perjuries, then the plaintiff's counsel request the court to charge the jury,

" 13. That the estate of the parties was an estate in joint-tenancy, and that in such case partition of such estate could only be made by these parties by deed.

" That if the court should be of opinion that the estate of the par-

(Gratz *v.* Gratz.)

ties was not within the statute of frauds, and was not an estate in joint tenancy, but an estate in which they were tenants in common, then the plaintiff's counsel request the court to charge the jury,

"14. That the partition could then only be made by these parties, by a parol agreement, accompanied by the possession of the two-thirds of the premises delivered to *Simon Gratz* by the plaintiff, or assented to by him, in pursuance of the parol agreement."

His honour Judge HALLOWELL proceeded to charge the jury as follows :

"This is an action by *Hyman Gratz* against *Simon Gratz*, to effect a partition between these parties, who are joint-tenants or tenants in common ; the plea is, that they do not hold together.

"The question between these parties can be settled on fair and simple principles. Much has been said in relation to the statute of frauds, and a parol agreement, and if the plaintiff can recover on an equitable estate.

"I shall say nothing on part performance or ouster. There is matter in the cause which can settle it without either. And I shall confine myself pretty much to what is called the submission and the award.

"These parties were partners ; the partnership was dissolved in *January* 1827. They were at variance, and they resorted to a domestic tribunal, in order to settle all things in difference, that had, might or should occur between them. (The judge here read the submission of the eighth of *June*, 1827.) This submission was signed by the parties and the other members of the family.

"Mr. *Binney* and Mr. *Chauncey* tell you of their idea of the cast of the writings. But we are to judge, not merely by the writings, but by the acts of the parties. They tell you of the transactions of the parties, of their discord, &c.; they were obliged to call their friends together.

"In 1830, *Hyman* was desirous of dividing the property. He drew a plan ; sent it to *Simon* ; they could not agree ; one or other of them, no matter which, called these gentlemen together ; they proposed the referees should divide it ; the referees said no, we do not understand the business ; the name of Mr. *Baker* was suggested, I believe, not by the referees, perhaps it does not appear by whom, and agreed to ; he took the plan, made a division, and when the division was made, the parties appeared before the referees ; *Simon* said he did not like the division ; made some objection ; *Hyman* said it was a fair division, and after some conversation, *Hyman* said to *Simon*, you may have your own choice ; and before they separated, the division by Mr. *Baker* was agreed to by both parties. *Hyman* was well pleased ; *Beates* was spoken to, and *Haines* was spoken to as to the survey. On Friday, the twelfth of *February*, *Hyman* suggested to *Simon* that there was some difference, or made some observation in respect to a privilege or alley. However, there was some

(Gratz *v.* Gratz)

conversation in respect to a privilege or alley. *Hyman* said it could not be so. On Monday, *Hyman* said he was not satisfied. Some days after he wrote a note that he was not agreed, and would retain his one-third interest. Mr. *Binney* drew up instructions to *Michael Baker* how to conduct himself in making the division.

"On the afternoon of the seventeenth, the referees and parties met. *Hyman Gratz* exhibited a long argument in writing, containing reasons why that partition should not stand, and why it should not be carried into effect. The referees, a few days after, wrote to the parties, that they had considered the subject, and that the partition should be carried into effect. On the third of *March*, 1830, *Hyman Gratz* writes a long letter to the referees. I intended to have read some of these papers, but will merely refer to them. On the seventeenth of *February* the referees awarded that the agreement should be carried into effect. To the third of *March*, the referees were under an impression that it was carried into effect. On the third of *March*, *Hyman Gratz* begs the referees would review the order they had made ; it was reviewed, and on the second of *April*, they wrote a note to *Simon* and *Hyman*, that after much reflection, they could not interfere. On the seventeenth of *February* they awarded ; they reviewed, reflected, and ordered the award to stand.

"The only real question then is, whether this determination by these gentlemen was conclusive between the parties, and is conclusive : if it be, by the plea the parties do not hold together, and the action cannot be supported.

"It is said first, that it is not within the submission. If there be any doubt we must take into consideration the situation of the family, and say whether it is not the true meaning of these parties that it should operate on all differences between the parties. Many things occurred afterwards : they were bound to go to these referees for any thing they could not agree among themselves about. The agreement of 1827 did not oblige the parties to go before the referees for anything they could agree about themselves, which is exemplified by the trust lands, and one instance where a writ of partition was resorted to. Was this then within the submission ? Had the referees jurisdiction of the matter in the manner they took it up ? After *Hyman* was dissatisfied, resort was had to the referees by *Simon* : both go there : *Hyman* does not say, you have nothing to do with this matter ; you will find that he argues this matter, and endeavours to shew that this partition should not be carried into effect. He does not say it is *coram non judice*, but he submits to their jurisdiction ; both parties do ; and *Hyman* never intimates any want of authority on their part. Mr. *Binney* says he does not recollect of any such objection until very late. Mr. *Chauncey* the same. When a man comes into a forum, his first thing is to plead to the jurisdiction, which he must do or he is concluded. My opinion is, that on the agreement of *June*, 1827, the documents and general conduct of the parties, these gentlemen had jurisdiction to do what they did, to make the award that this

(Gratz *v.* Gratz.)

partition by *Michael Baker* should be carried into effect. They have shut up a great many things by this award. Whether the agreement by parol of the twelfth was binding, was shut up by the award, for it was competent for *Hyman Gratz* to have said to the referees, You are lawyers, this agreement was by parol, and void, and I ask to be exonerated; he does not; there is no knowing what might have been their decision; but every thing was shut up and concluded by the award.

" My opinion is that this matter, whether the partition made by *Michael Baker* was valid or not, was within the jurisdiction of the referees, and their decision is binding and conclusive between the parties. My opinion is founded on the award, and that it is binding and conclusive. A number of other points have been submitted to me by the plaintiff's counsel, and they may consider that I decide them in their favour, except so far as they are qualified by the special charge now given. For the matter of the award on which I have fully charged, is sufficient to enable you to make up a verdict, which I advise you to find for the defendant."

The jury having retired, the judge afterwards sent for them into court, and on their appearing, said,

" I want to say something by way of explanation as to the plaintiff's points. On examination of them I have found this proposition which I wish to explain.

" The award of the seventeenth of *February*, 1830, vests no separate estate in the parties, because it does not direct that mutual releases, conveyances, or assurances, be executed by the parties.

" If I were to let this go to you without explanation, I might appear inconsistent. I meant to tell you, and I now tell you, that the award of the seventeenth of *February*, vests a separate estate in *Simon Gratz*, as to two-thirds of the property, and that the effect of the award is to direct that mutual releases, conveyances, &c. be executed."

The counsel of the plaintiff excepted to his Honour's opinion, and in this court filed the following

### Specification of Errors.

" 1. Because the Judge overruled the testimony of *Michael Baker*, witness for the plaintiff. His testimony was as follows:

" My impression is, that both were together. I objected to having any thing to do with the property. I was told by both those gentlemen (plaintiff and defendant), that I was to take the plan and divide it into three shares. I divided the property equitably, as I thought, and returned a report to that effect. This is the report. Nos. 2, 3, 4, and 5, are the property that was most suitable together.

" The error assigned is in overruling the last sentence of his testimony; " Nos. 2, 3, 4, and 5, are the property that was most suitable together"—and thereby precluding the plaintiff from giving that and further testimony of the basis on which he had founded his report.

(Gratz *v.* Gratz.)

" 2. Because after having admitted in evidence on the part of the defendant, sundry letters and other papers of a date subsequent to the commencement of the suit, the judge rejected sundry other letters and papers, to and from the parties to the suit, concerning the subject-matter in dispute before the jury, but which were of a date subsequent to the commencement of the suit, and which were offered in evidence on the part of the plaintiff as rebutting testimony.

" 3. Because the Judge erred in charging the jury, that his opinion was, that on the agreement of June, 1827, on the documents and general conduct of the parties, these gentlemen (Mr. *Binney* and Mr. *Chauncey*), had jurisdiction to do what they did, and to make the award that this partition by *Michael Baker* should be carried into effect, and withdrew the consideration and decision of the facts of the case from the jury.

" 4. Because the judge erred in charging the jury that this matter whether the partition made by *Michael Baker* was valid or not, was within the jurisdiction of the referees, and that their decision was binding and conclusive between the parties; inasmuch as the question of jurisdiction depended on facts as well as documents, which the jury were thereby precluded from considering.

" 5. Because the judge charged the jury to find a verdict for the defendant in such a manner as to leave the jury to understand that the evidence offered by the plaintiff was wholly insufficient and immaterial, and that the award alone was so binding and conclusive on the jury, that their verdict ought to be for the defendant, without regard to any of the plaintiff's evidence.

" 6. Because there was error in the manner of the judge's deciding the points of law made by the plaintiff's counsel, for the purpose of obtaining his charge thereon to the jury.

" 7. Because the award of the seventeenth of *February* was of matters not submitted by the parties; and the judge erred in charging that it was.

" 8. Because the judge erred, when he subsequently sent for the jury into court, in charging them (in explanation of his previous charge, that he had decided all the points of the plaintiff in the plaintiff's favour) that the award of the seventeenth of *February*, vested a separate estate in *Simon Gratz* as to two-thirds of the property, and that the effect of the award was to direct that mutual releases or conveyances be executed by the parties.

" 9. Because his advice to the jury to find a verdict for the defendant, is inconsistent with a decision in the plaintiff's favour of the points made by the plaintiff, with the explanation added.

" 10. Because these points, with the explanation added, entitled the plaintiff to a verdict.

" 11. Because the judge erred in charging, that the submission and award, and their validity in this case, were a question of law, and that the law thereon was with the defendant, and the verdict should be for him.

" 12. Because the judge erred in charging the jury, that the parties had made a legal partition of their undivided interest in the property in question, exclusive of the evidence relating to the provisions of the statute of frauds, and part performance to take the case out of operation of that statute.

" 13. Because in charging that the award itself (or alone) was binding and conclusive on the plaintiff, the judge delivered contradictory or inconsistent law to the jury, having determined in one of the points, that it was not binding on the plaintiff, unless acquiesced in or executed by him."

After argument by *Purdon* and *J. Randall* for the plaintiff in error, and by *J. R. Ingersoll* and *J. Sergeant* for the defendant in error,

The opinion of the court was delivered by

KENNEDY, J.—The first and second errors consist of exceptions to the opinion of the court below, in overruling testimony offered by the plaintiff in error, who was also the plaintiff below.

The first is, that the court prevented the plaintiff from showing that in making a partition of the property in question, into two parts, one whereof to contain one equal third part, and the other two equal third parts of the whole, that the parcels of the property numbered 2, 3, 4 and 5, upon the ground plot exhibited, would have been more suitable for making up the division, which was to contain two equal third parts of the whole, than any other of the six numbers which embraced the whole of it, according to the plot. I cannot say that I perceive any error in rejecting this evidence ; for if the parties, as was alleged by the defendant, had by agreement between them, made a partition of the property, by which other numbers than those of 2, 3, 4 and 5, were associated for the purpose of forming the division which was to contain two equal third parts of the whole of it I do not think it would have been sufficient to have set such partition aside, to have shown that in the opinion of witnesses, a more equal and convenient partition of the property might have been made, by joining Nos. 2, 3, 4 and 5, to make up the allotment of two-thirds. And unless the testimony so rejected were offered for this purpose, I cannot perceive that it had any pertinency to the issue trying, and believing it altogether insufficient to effect such an object, I am therefore brought to the conclusion that it was properly refused.

With respect to the second error, as the sundry documents, letters and other papers mentioned in the assignment of it, which are alleged by the plaintiff's counsel to have been offered by them as rebutting evidence to the jury, and to have been rejected by the court, do not appear to have been brought up with the record, or to be connected with it in any way, we cannot see it, and have no means of knowing what it was, whether it had any bearing upon or relevancy to the issue or not; and how is it possible for us then to determine upon its admissibility ? But, it is said, that these letters, documents and other

papers rejected by the court to be received as evidence, are stated upon the record to be to and from the parties in the suit, *touching* the premises in question and matters in dispute; and that similar letters, documents and other papers as to dates, were previously read by the defendant's counsel without objection by the plaintiff's, and without its having been adverted to by the judge that they were dated after the suit brought, and as it was on account of their being dated after the commencement of the action that they were rejected, it was error in the judge to do so.   It would not be right to test the admissibility of evidence by the insufficiency of the reason assigned by the court below for rejecting it.   A right judgment is not to be reversed on account of a wrong reason given for rendering it.   What those letters and other papers given in evidence previously by the defendant were, does not appear, more than those which were offered by the plaintiff and rejected by the court.   But, admitting that they were letters, &c. " *touching* the premises in question and matters in dispute," it does not follow that they were in any possible view material to the issue.   What does the term ' *touching*' mean, as used here, upon which great stress has been laid?—simply ' *mentioning.*"   The court below, then, refused to receive in evidence letters, &c. *mentioning* the premises in question and matters in dispute.   Now, nothing can be more easy than to imagine, that writings might have been made and passed between the parties, both before and after the commencement of the action, *mentioning* the premises in question and matters in dispute, and yet neither expressly nor impliedly admitting or denying the fact of a partition of the property having been made, which is the great point in issue here: but unless they tended to establish the affirmative or negative of this fact, it is not easy to conceive how they could have been relevant.   It is also alleged that as the defendant made no objection to the plaintiff's reading in evidence those documents which were rejected by the court, the court had no right to prevent the plaintiff from doing so after having permitted the defendant to give testimony of somewhat similar character.   This surely cannot be a sufficient reason to justify the court in consuming time unnecessarily with the trial of a cause, thereby subjecting the county to additional and unnecessary expense, as well as delaying the trial of other causes, which is a still greater evil.   It is doubtless the bounden duty of the court, as soon, and as often as it shall discover clearly that evidence which is about to be given on the trial of a cause, no matter at what stage of it, is irrelevant and has no bearing whatever upon the issue, to interfere and reject it.   And as it does not appear here that the testimony rejected could have been in any respect material to the issue, we cannot say that the court erred in refusing to receive it.

Eleven other errors have been assigned, consisting of exceptions to the charge of the court to the jury.   They however all relate to the opinion of the court on the effect of the award of the arbitrators made on the seventeeth of *February*, 1830, and an examination into the

nature of this award, and the correctness of the opinion of the court below in respect to it, will dispose of the main question in the cause, and render a particular notice of these eleven errors in detail unnecessary. His Honour the judge below told the jury ; " My opinion is that on the agreement of the eighth of *June*, 1827, the documents and general conduct of the parties, these gentlemen (the arbitrators) had jurisdiction to do what they did, to make the award that this partition by *Michael Baker* should be carried into effect." And again he repeats to them, " My opinion is, that this matter, whether the partition made by *Michael Baker* was valid or not, was within the jurisdiction of the referees, and their decision is binding and conclusive between the parties. My opinion is founded on the award, and that it is binding and conclusive." And in the conclusion he adds, " For the matter of the award, on which I have fully charged, is sufficient to enable you to make up a verdict, which I advise you to find for the defendant."

The submission of the eighth of *June*, 1827, to *Charles Chauncey* and *Horace Binney*, esquires, being of *all matters in variance* between the parties, and having been reduced to writing and signed by them, would doubtless have been sufficient, had the partition of the property in question been then one of the matters in variance, to have authorised these gentlemen to have awarded a partition of it, and to have directed in what manner it should be executed ; for the terms of the submission are sufficiently comprehensive to embrace any matter then in dispute between the parties in respect to real, as well as personal estate. *Marks* v. *Marriot*, 1 *Ld. Raym.* 114 ; *Munro* v. *Alaire*, 2 *Caine's Rep.* 327 ; *Sellick* v. *Adams*, 15 *Johnson's Rep.* 199. *Byers* v. *Van Deuson*, 5 *Wend.* 268. But the arbitrators by their award of the seventeenth of *February*, 1830, have not directed a partition of the property to be made in any particular manner. Their award is in these words, " We are of opinion and do award that the partition of the *High* street and *Seventh* street property, agreed between you according to the plan of *Michael Baker*, shall be carried into effect." It is obvious from the terms of the award, that the gentlemen arbitrators, did not consider it as submitted to them to decide and direct in what manner, and in what proportions the partition of the property should be made between the parties, but merely to determine as they stated in their note to Mr. *Hyman Gratz* of the twelfth of *May*, 1830, whether an agreement made by the parties in the presence of the arbitrators, as they allege, in regard to the partition of the property, should be carried into effect or not. But as this agreement upon which the arbitrators acted, and which is made the foundation of the defendant's defence, is admitted by him to have been made as late as the twelfth of *February*, 1830, long after the submission of the eighth of *June*, 1827, it or any matter in variance growing out of it between the parties, could not of course have been embraced within that submission. The written instructions given to Mr. *Baker*, under which he made out his plan of the property that is

(Gratz *v.* Gratz.)

referred to in the award were not delivered to him before the tenth of *February*, 1830, and on the second day following that, he reported his plan, distinguishing it by six Nos. or parcels, and dividing the whole into three allotments.  Hence it is evident that the subject-matter of the award of the seventeenth of *February*, 1830, was not within the submission of the eighth of *June*, 1827, and if there were no other submission agreed on between the parties embracing it, this award would clearly be void for want of authority on the part of the arbitrators to make it.   *Plowd.* 396. *Dyer*, 242.   1 *Bac. Abr.* tit. *Arbitrament & Award*, [E.] page 213.   *Huff* v. *Parker*, cited 4 *Dall.* 285.   3 *Yeates*, 567.   *Gurman* v. *Hill, Aleyn*, 26.   *Hooper* v. *Pierce*, 12 *Mod.* 116.   *Anon.* ibid. 8.   The submission of the eighth of *June*, 1827, being the only one that is pretended to have been in writing, and to have been signed by the parties, it necessarily follows, that if any submission were made, embracing the dispute between the parties in respect to the agreement said to have been made, by which they agreed to make a partition of the property in a particular way, according to a plan of *Michael Baker*, it must have been merely verbal.   This agreement if made, was also verbal, and seems to have been denied by *Hyman Gratz*, in all his written communications anterior to the making of the award.   In his communication to *Simon Gratz*, on the fifteenth of *February*, 1830, he mentions it as a division *proposed*, not agreed on, and as it would not make an equitable or equal division of the property according to its value, he therefore declines entering into the arrangement.   And again, in his written communication read to the arbitrators on the seventeenth of *February*, 1830, the same date of the award, after stating to those gentlemen that they had been called together by *Simon Gratz*, as he conjectured, to make some order for the deeds, in case they (the parties) had agreed on the division of the property, he says, " We have not agreed, nor can we agree; my note to *Simon* informed him of this." This agreement for partition, however clearly and satisfactorily it might be established, being verbal and never reduced to writing, comes within the act of assembly against frauds and perjuries, and cannot pass the right which the one party had at the time of the agreement of division, to the other, in that part of the property, which by the agreement was allotted to be held in severally by the latter. It has however been contended, that there was such a partial execution at least of this agreement of partition, as was sufficient to take it out of the act against frauds.   If this be so, there was certainly no evidence given of it on the trial of the cause.   The acts of *Hyman Gratz* in employing and giving instructions to the scrivener to draw a deed of partition or other writings, deemed necessary for carrying the partition into effect, and in going upon the property with an artist, and measuring off and designating the lines of division acccording to the agreement, for the purpose of enabling the scrivener to draw the writings, and to describe the several allotments with precision and accuracy, cannot be considered of a character sufficient to take the

case out of the act against frauds. They were at most only prepa-
ratory to the execution or performance of the agreement for partition.
Neither could *Simon Gratz* without the assent of *Hyman Gratz,*
divest *Hyman* of his right to the property as a tenant in common with
*Simon,* by his withdrawing from the possession of that part of it,
which by the agreement, had it been carried into execution, would
have fallen to *Hyman,* and at the same time declaring, that he took
the exclusive possession of the residue, which he then had, and that
he intended to hold it in severalty according to the agreement of par-
tition, which he alleged was made between them. The assent of
*Hyman* to the execution of the agreement, was just as necessary in
order to render it effectual, as it was to the making of it to give it
validity.

It has also been further contended, that as *Simon Gratz* has the
legal title exclusively in himself to almost the whole of the property,
and the right on the part of *Hyman* is merely equitable, being a trust
resulting by operation of law, from the circumstance of its having
been purchased by *Simon* with the partnership funds of himself and
*Hyman,* he owning two-thirds and *Hyman* one-third thereof,
*Hyman* has no such right or interest in the property as makes it
necessary under the statute or act against frauds, to have an agree-
ment in writing signed by him in order to render the partition effec-
tual, and to transfer his right in that part of the property to *Simon,*
which according to the agreement was to be *Simon's* share of it.
The terms of the act against frauds 1 think are sufficient to embrace
equitable interests in lands as well as legal. The words are " all
leases, estates, *interests* of freehold, or term for years, or any un-
certain *interest* of, in, or out of any messuages, manors, lands, ten-
ements or hereditaments, made or created by livery and seisin only,
or by *parol* and not put in writing and signed by the parties so
making or creating the same, or *their agents* thereunto *lawfully au-
thorized by writing,* shall have the force and effect of leases or es-
tates at will only, and shall not either in law or *equity* be deemed or
taken to have any other or greater force or effect, *any consideration*
for making any such parol leases or estates, or any former law or
usage to the contrary notwithstanding; except, nevertheless, all
leases not exceeding the term of three years, from the making there-
of: and moreover, *no* leases, estates or *interests* either of freehold or
term of years, or any uncertain *interest* of, in, to or out of any mes-
suages, manors, lands, tenements or hereditaments shall at any time
be assigned, granted or surrendered, unless it be by deed or note in
writing, signed by the party so assigning, granting or surrendering the
same, or *their agents* thereunto *lawfully authorized* by *writing,* or
act and operation of law." The term " *interests*" being used here
without any other words to qualify or restrain its general and most
extensive signification, I am unable to discover any good reason why
it should not be considered and held to extend to *equitable* interests
in lands as well as legal. The equitable owner of lands lying in this

(Gratz *v.* Gratz.)

state is generally deemed to all intents and purposes the legal owner of them, even as against the trustee himself, except in those cases where for the purpose of executing the trust, it may be necessary for the trustee to have possession and control of the estate. As well might it be said that equitable interests or estates in land within the state are not embraced by our acts of assembly providing for the recording of deeds and conveyances made of and concerning them; and that the first vendee of an equitable estate in land for a valuable consideration, shall be preferred to a subsequent *bona fide* purchaser for a valuable consideration without notice, whether the first vendee have put his deed on record or not within the time prescribed by the act; for the rule on this subject, setting aside our recording acts, would be, *qui prior est in tempore, potior est in jure.*

The late Mr. Justice DUNCAN, in *Wither's Appeal,* 14 *Serg. & Rawle,* 193, says, "although the seventh section of the statute of frauds (meaning the English statute) which enacts that all the declarations or confessions of trust or confidence of any lands, &c. shall be manifested and proved by some writing, is not incorporated into our law, yet in substance it is comprehended in the first section of the act;" and then he recites what he considered the true reading of that section thus, "no interest in land, either in law or equity, shall pass by parol only, any consideration for making the agreement to the contrary notwithstanding, except for a term not exceeding three years; nor except by deed or note in writing signed by the party, or by the act and operation of law." It is under the last clause and exception of this section which I have recited literally above, that *Hyman Gratz* became invested with his right to the property, and would be permitted to show it by parol evidence in case it were denied. It arose and was created by the operation of the law upon the act of *Simon Gratz* in his employing the joint funds of himself and *Hyman* to pay for the property, and in taking the deed of conveyance for it, in his own name alone. It is however, admitted, or at least not denied by the counsel for the defendant, that an agreement, in order to make it effectual, and pass the right or interest of the defendant in any part of the property in dispute, must be in writing and signed by him, otherwise it would come within the act of frauds. Then I apprehend that unless the agreement of partition were sufficient to pass *Simon's* interest to *Hyman* in that part of the property, which by the division agreed on was to belong thereafter to him in severalty, it would be equally insufficient to transfer *Hyman's* interest to *Simon* in that portion of the property, which by the agreement of partition was allotted to him; for it is a rule particularly applicable to agreements, where mutuality of concessions between the parties, form the whole and only consideration for making them, that there must be a complete reciprocity of obligation, benefit and effect arising from the agreement, according to the full extent of the intention of the parties, otherwise it will not be binding on either. Indeed it is manifest, that unless this were so, one of the

(Gratz *v.* Gratz.)

parties would often part with his right without receiving the *quid pro quo* intended, and expressly mentioned to be given him by the terms of the agreement. It is still further argued, that as the binding efficacy of this agreement of partition, which is said to have been made, was submitted by mutual agreement of the parties to arbitrators as judges of their own choosing, who in deciding between them, were not tied down by the strict rules of law, and as these judges have decided that the partition of the property agreed between the parties according to the plan of *Michael Baker*, shall be carried into effect, they are both concluded by this judgment or award of the arbitrators, and cannot after it interpose the statute of frauds, or anything else, to defeat the specific execution of the agreement for partition. This argument is may be observed, is predicated upon the assumption that this matter, upon which the arbitrators awarded, was submitted to them by the agreement of the parties, a fact which seems to be denied by the plaintiff, and therefore ought to have been left to the decision of the jury by the court below. The court however, conceived that it was embraced within the submission of the eighth of *June*, 1827, which was admitted by both parties to have been made, but did not, and in the very nature of things, as I have already shown, could not have embraced this matter. The judge below, therefore, misdirected the jury in this particular. If there were no submission of this matter to the arbitrators, upon which they awarded, the award of course would be an absolute nullity, but if there were a submission of it, it must have been a verbal agreement of submission, as it is admitted that there never was a submission in writing, and signed by the parties, except the one of the eighth of *June*, 1827, which was altered in some respects on the fourteenth of *May*, 1828. Now, as a submission is in the nature of an authority granted to the arbitrators, can that authority be deemed sufficient to authorise them to dispose of the interest of the parties, or of either of them, in real estate, consistently with the act against frauds, unless that authority, or in other words, the submission, be in writing ? The words of the act, as we have already seen, are that *no interests* in lands shall at any time be *assigned, granted* or surrendered, unless it be by deed or *note in writing*, signed by the party assigning, &c. or their *agents*, thereto lawfully *authorised by writing*, or by act and operation of law. It cannot be pretended that the act of the arbitrators is the act of the law, and therefore *taken out* of the general provisions of the act by the exception contained in the last clause of the section. Arbitrators act entirely under the authority, in such cases, that is given to them by the parties in the terms of the submission. Without this they cannot act at all ; and if they do any act not authorised by the terms of the submission, it is clearly void. Under this view of the act against frauds, I think that the arbitrators without a submission in writing from the parties, could neither make a partition of the property between the parties, nor yet award a partition of it to be made, so as to pass the interest of each party to the

other in his respective share, as is done in partition by operation of law, or by act of the parties in executing mutual releases, or so as to conclude the parties from asserting their former rights and manner of holding the land.   The award of the arbitrators made under a verbal submission, cannot therefore, at it appears to me, be of greater force and efficacy, than a verbal agreement fairly made between the parties of the same purport.   If one of the parties should refuse to comply with it, it may be a good cause for a suit, and that perhaps is the most that the other party can have for any actual loss sustained by a non-performance.   But taking it to be true that the award in this case was made under a submission mutually agreed to between the parties, it is not such an award as either party could maintain an action against the other on account of his not having complied with it.

In 1 *Bac. Abr.* tit. *Arbitrament and Award,* [E] page 212, 13, it is laid down, that " as an award is a judgment, and can only be *expounded by itself,* without the aid of an averment of matter *dehors* to explain the meaning of the arbitrators, it is necessary that it should appear on the face of it."   This principle is also sustained in *Dyer,* 242, *b.*   And in *Bac.* again, at page 218 it is repeated, that an award is in the nature of a judgment, it ought to be wholly decisive ; for if it doth not determine the matter, it becomes the cause of a new controversy ; therefore, if the arbitrators award a bond for quiet enjoyment of lands, without appointing a certain sum, this is a void award, and the party is not obliged to give bond to the value of the land, as he would be in case he had made a covenant to enter into such a bond, for then the sense of the award must be supplied by averment. *Samon's Case,* 5 *Co.* 78.   *S. C. Cro. Eliz.* 432.   So if the arbitrators award that one party shall give security to the other for the payment of sixteen pounds, this is not a good award, because it does not appear what security, whether bond or otherwise.   *Thinne* v. *Rigby, Cro. Jac.* 314.   *S. C. Jenk.* 340.   *Tipping* v. *Smith,* 2 *Strang.* 1024.   And although awards are now considered with greater latitude and less strictness than they were formerly, yet it is still indispensably necessary that they should appear upon their face to be *final* and *certain.* This certainty may be judged of according to a *common* intent, and such as is consistent with fair and probable presumption.   *Hawkins* v. *Colclough,* 1 *Burr.* 277.   The award in the present case appears to be defective in regard to certainty.   It directs, " that the partition of the *High* street and *Seventh* street property agreed between the parties according to the plan of *Michael Baker* shall be carried into effect."   The description of the property seems to be entirely too vague and uncertain, unless the reference to Mr. *Baker's* plan should help it, which possibly may be the case.   This, however, is not the principal feature of uncertainty in it ; for the partition is directed to be made in conformity to this plan of Mr. *Baker,* and according to an agreement made between the parties, which agreement is not found or set out by the arbitrators.   The plaintiff denies that he ever made

any agreement of partition; and without it were in writing and re-
ferred to or recited in the award, so that it could be identified; or the
arbitrators had reported what the terms of the agreement were, by
incorporating the whole of it into their award, how is it possible to
say in what manner the partition awarded by them was intended to
be made? It does not appear in what proportions the property was
intended to be divided and allotted to the parties respectively, whether
an equal moiety of it to each, or two-thirds thereof to one, and one-
third to the other; or whether in either of these proportions, is alto-
gether uncertain, and cannot be ascertained except by averments
and the introduction of parol evidence, which is not at all admissible.
Neither is it possible to discover from the award what the property
consisted of, and what part of it the plaintiff or defendant was to have
for his share. It contains no instructions that are intelligible, for
making a partition, unless to the arbitrators and the parties them-
selves. If a partition were to be made of the property, it might be
difficult, if not impossible, to decide whether it was in conformity to
the award or not. No doubt the arbitrators put enough on paper at
the time to make themselves perfectly well understood by the parties,
who, had they both been disposed to comply with the award, would
probably have found no difficulty in making the partition, on account
of not understanding and knowing fully what it was that the arbitra-
tors intended each should do, in order to carry the partition into
effect. It is evident to me that the arbitrators did not intend that
any particular division of the property directed by them should be en-
forced further than the parties themselves should carry the same
into effect from principles of honour, otherwise an award unexcep-
tionably good, in form at least, would have been made, as gentlemen
more competent for such purpose could not have been found. But
then, it must be observed, that it is not barely sufficient in order to
make an award good, that the parties, as well as the arbitrators,
should understand what was meant and intended by it, at the time
of making it. It ought to be in such clear and intelligible terms, that
every one who reads it may comprehend and understand it. The
arbitrators cannot be called on, nor will they be admitted to declare
and explain what it was, that they intended by their award. Their
meaning must be collected from the face of the award itself; except
" when the words of the award have relation to things certain out of
the award, these may be averred, for that is the express mind of the
arbitrators, which they have expressly referred to." 1 *Bac. Abr.* tit.
*Arbitrament and Award,* 218-19. As where an award was made that
*A.* should permit *B.* to enjoy certain leases of lands purchased from
*J. S.* and that *B.* should pay the rents and perform the covenants and
deliver to *A.* a true copy of the leases and pay the *arrears* to the
*time of the purchase from J. S.,* it was held a good award as to the
rents and covenants, though not particularly specified; because by a
reference to the leases which were in writing, and therefore certain,
the minds of the arbitrators would be found to be as clearly and in-

(Gratz *v.* Gratz.)

telligibly expressed, as if they had repeated the same in their award ; but as to the arrears of the rent, which could not be ascertained without recourse to parol evidence, the award was held to be void for uncertainty.  *Massey* v. *Aubry, Style,* 365.  So the agreement for partition of the property referred to in the award in this case, not being in writing, is altogether uncertain in respect to its terms and conditions, if not its existence, and could only be ascertained by means of parol evidence and a jury, who would have to determine on its import, and the intention of the parties in making it, as a matter of fact ; and whether they would put the same construction on the intention of the parties in making such contract, as the arbitrators did, may be very doubtful, and thus, in effect, the most material and important part of the award, would be referred to a jury for its interpretation, instead of the court, which is certainly the proper tribunal to give a construction to awards that are in writing.  In the case of *Bedam* v. *Clerkson,* 1 *Ld. Raym.* 123, an award to deliver up a *certain writing obligatory* without specifying the date or penalty, was adjudged void for uncertainty.  Also in *Pope* v. *Brett,* 2 *Saund.* 292, 295, an award that *A.* should be paid and satisfied by *B.* the *money due and payable to him for work,* and that *A.* should pay twenty-five pounds to *B.,* and that each of the parties should give the other a general release, was held to be void on account of the uncertainty as to the sum that was due for the work.  In this last case, doubtless the money awarded to be paid to *A.* for his work, was due to him under an agreement made with *B.,* but still it would not have helped the award, if the arbitrators had directed the money that was due to *A.* by *B.* for work, to be *paid according to their agreement,* which would have made the case similar, even in terms, to the case under consideration.  In *Schuyler* v. *Van Der Veer,* 2 *Caine's Rep.* 235, it was held, that an award " to finish the house" and " to pay for the stone," without saying what house or what stone, was void for uncertainty. I will refer also to the case of *Johnson* v. *Wilson, Willes's Rep.* 248, without saying that I should feel myself bound by it, were the same question to come before me for determination, but it being a late case I cite it to show what has been adjudged necessary, in order to make an award good for the partition of real estate.  The arbitrators in the case divided and allotted the whole of the estate in severalty among the parties, which had been previously held by them as tenants in common, but did not direct any deeds of conveyance to be executed to vest the allotments in the respective owners, and for this defect the award was held to be void.

To supply such deficiencies in awards by averments, and the introduction of parol evidence is so contrary to the established rule, as never to be thought of at the present day, and to do so indeed would overturn the whole doctrine as it regards awards in this respect.  Besides as the defendant in this case claims from the award the effect of a partition of real estate, the introduction of parol evidence to show the terms and the extent of the verbal agreement between the par-

(Gratz *v.* Gratz.)

ties referred to in the award, in order again to extend the meaning and operation of the award, would militate against the express provisions of the act against frauds and perjuries, and upon this ground I also conceive it inadmissible.

Having shown that the award for carrying a partition of the property in dispute into effect is void; it can present no objection whatever either in a legal or an equitable point of view, to the claim on the part of the plaintiff to have partition made of it.    Neither can the circumstance of *Simon's* having mortgaged the whole of the property, he having the legal title to it in himself, and having bound himself at the same time by his bonds, for the payments of debts owing by him and *Hyman* jointly, be any objection to the property's being divided before *Hyman* shall pay his proportion of these debts: for in making the partition both parties will take their respective allotments, charged with, and subject to the payment of them.    Each will still have to pay his proper proportion, so that neither can gain or lose by making partition of the property on this account.

The judgment is reversed and a *venire facias de novo* awarded.